UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

TIFFANY W. DEARING )
)
V. ) NO. 2:14-CV-112
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. Plaintiff's applications for Supplemental Security Income and Disability Insurance Benefits under the Social Security Act were denied following a hearing before an Administrative Law Judge ["ALJ"]. Plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 18], and the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 21].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues

differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 22 years of age on her alleged disability onset date of May 26, 2011. She has a limited education. There is no dispute that in her present condition she is incapable of performing her past relevant work. For purposes of obtaining Disability Insurance Benefits, plaintiff must show she was disabled on or prior to March 31, 2012, when her insured status expired.

Plaintiff suffers from severe diabetes, and has had it since at least the age of 8. Related to the diabetes is a seizure disorder and attendant depression. Plaintiff is also obese.

Her medical history is recounted in the Commissioner's brief as follows:

> Plaintiff was admitted to the hospital for four days in July 2010 for pneumonia and mild diabetes ketoacidosis (DKA) (Tr. 257). She stated she had a hard time controlling her blood sugar at home (Tr. 259). Her DKA resolved uneventfully with insulin (Tr. 257). Her x-rays showed that her pneumonia improved markedly during her stay (Tr. 257, 286, 288). She was to follow up with her primary care physician (Tr. 257).
> On April 15, 2011, about one month prior to her alleged onset date of disability, Plaintiff began a treatment relationship with Katherine Gray, M.D., to treat her type 1 diabetes (Tr. 376-78). She told Dr. Gray that she had been diagnosed with diabetes in 1997 (when she was eight-years old) and had been managed with insulin (Tr. 376). Plaintiff reported frequent urination and hypoglycemic episodes (confusion and shakiness), but denied blurred vision, constant hunger, excessive thirst, chest pain, dyspnea, or burning of extremities (Tr. 376). Her home blood glucose levels ranged from 27 to 300 (Tr. 376). Plaintiff's physical examination was normal (Tr. 378). Dr. Gray noted that Plaintiff's diabetes was uncontrolled, and that the high and low blood sugar

2

readings, occurring at the same time of day, were likely due to an erratic diet and schedule (Tr. 378). Her laboratory results indicated her A1C level was 10.3 and her estimated average glucose was 249 (Tr. 383).

On April 28, 2011, Plaintiff reported hypoglycemic episodes with home blood glucose levels ranging from 23 to 231 (Tr. 374). Her physical examination was normal (Tr. 375). Dr. Gray noted that Plaintiff had an appointment scheduled to obtain a continuous sensor and alarm to prevent extreme lows and highs (Tr. 375).

On May 12, 2011, Plaintiff went to the emergency room with a sunburn on her back and legs (Tr. 343). She had no other complaints (Tr. 343). Her physical examination was normal, except to note sunburn on the back of her neck, shoulders, and the backs of her thighs (Tr. 344).

On May 27, 2011, Plaintiff followed-up with Dr. Gray for her diabetes (Tr. 371). She reported increased fatigue, hypoglycemic episodes, and heartburn (Tr. 371). Her home glucose readings ranged from 53 to 366, with an average of 140 (Tr. 371). Dr. Gray noted that Plaintiff's schedule was rather unpredictable and that if Plaintiff's blood sugars were not under better control, she would try to attain a continuous sensor for her (Tr. 372). The next day, Plaintiff went to the emergency room reporting a bilateral temporal headache that had continued for three days (Tr. 338). She had passed out two days earlier and reported that her blood sugar had been low the whole day (Tr. 340). She had lost consciousness for 15 to 30 minutes (Tr. 340). A computed tomography (CT) scan was compatible with acute left maxillary sinusitis (Tr. 338). No acute intracranial pathology was identified (Tr. 338). Her physical examination was normal (Tr. 341). She was instructed to follow-up with her primary care physician only if needed (Tr. 341). On May 31, 2011, Plaintiff saw Dr. Gray for her reported syncope with symptoms of blurred vision, light-headedness, and loss of consciousness (Tr. 369). She stated that problem was recurring over the past six days and lasted five to fifteen minutes (Tr. 369). She stated she had prior episodes when she was 15 and again when she was pregnant (Tr. 369). Dr. Gray noted that Plaintiff's prior episodes had been associated with hypoglycemia, and that Plaintiff's echocardiogram (ECG) and neurologic examinations were normal (Tr. 370). A June 9, 2011 ECG was essentially normal (Tr. 336-37). Her ejection fraction was 60 to 65 percent and she had mild mitral regurgitation (Tr. 337). A June 13, 2011 electroencephalogram (EEG) was normal (Tr. 364). The provider noted that there were no significant asymmetries and no epileptiform discharges (Tr. 364). Photic stimulation and hyperventilation induced no significant effects upon the tracing (Tr. 364).

About one week later, in mid-June 2011, Plaintiff went to the emergency room after she had been stung by a bee and had accidentally stuck her right thumb with the epinephrine auto-injector (epi-pen) when trying to get it open (Tr. 333). She denied any shortness of breath, rash, or discomfort (Tr. 333). She had no other symptoms (Tr. 333). Her physical examination was normal (Tr. 334). She was discharged with instructions to follow up with her primary care physician

3

(Tr. 334).

A June 28, 2011 magnetic resonance imaging (MRI) scan did not identify any acute intracranial abnormality (Tr. 361). The ventricles were normal in size and within the midline, normal gray-white matter differentiation present, no acute hemorrhage of shift of midline structures were identified (Tr. 361). There were no enhancing masses identified in the brain parenchyma and normal signal void was identified in the intracranial arterial vasculature (Tr. 361). There was no acute cortical infarction (Tr. 361).

On July 6, 2011, Plaintiff reported that she had experienced a seizure the day before and was experiencing seizures twice each day (Tr. 366). She reported home blood glucose levels ranging from 42 to 349 (Tr. 366). She was not driving (Tr. 366). Her physical examination was normal (Tr. 367). Dr. Gray gave Plaintiff information on carb counting and scheduled her to see a dietician (Tr. 367). She suspected that irregular meal intake was largely to blame (Tr. 367). Dr. Gray noted that Plaintiff was not experiencing hypoglycemia during her seizure events and changed her medications (Tr. 367). A July 19, 2011 sleep-deprived EEG was normal (Tr. 358).

On August 8, 2011, Steven Rider, M.D., of the Knoxville Neurology Clinic, examined Plaintiff for her reports of seizures (Tr. 418-19). He noted that she had experienced a seizure at age 15 associated with a low blood sugar (Tr. 418). She had a car accident with loss of consciousness and facial lacerations in 2007 (Tr. 418). In May of 2011 she had generalized convulsive activity witnessed by her companion with ictal eye closure (Tr. 418). He noted that previous EEGs and MRIs were normal (Tr. 418). She was not on any medications; she had been prescribed Keppra, but had not started taking it yet (Tr. 418). Dr. Rider instructed Plaintiff to start taking the Keppra and told her to not drive until she had been seizure free for six months (Tr. 418).

On September 4, 2011, Plaintiff went to the emergency room with hypoglycemia (Tr. 446). Her home blood glucose reading had been 31 (Tr. 446). She reported that she had become unresponsive, her eyes had rolled back in her head, and she shook all over for approximately 30 minutes (Tr. 446). Her fiancé administered an insulin injection, and after 30 minutes, her home blood glucose level was 87 (Tr. 446). She reported a mild headache, but stated she had much worse headaches before (Tr. 446). Her physical examination was normal (Tr. 447). Her glucose level at the hospital was 96 (Tr. 448). A CT scan and chest x-ray were normal (Tr. 454-55).

On September 8, 2011, Plaintiff followed-up with Dr. Gray after her emergency room visit (Tr. 475). She told Dr. Gray that she had been experiencing frequent infections, frequent urination, increased fatigue, slow healing wounds/sores and hypoglycemic episodes (Tr. 475). She reported no other symptoms (Tr. 476). Pertinent negatives included blurred vision, constant hunger, excessive thirst, foot ulcers, chest pain, dyspnea, diarrhea, or burning of extremities (Tr. 475). Her home blood glucose levels ranged from 31 to 307 (Tr. 475). Plaintiff told Dr. Gray that she had not experienced hypoglycemia since her

4

visit to the emergency room (Tr. 475). Her physical examination was normal (Tr. 476).

On September 13, 2011, Anita Johnson, M.D., a State agency medical consultant, completed a physical RFC assessment (Tr. 384-92). She opined that Plaintiff had not established any exertional, postural, manipulative, visual, or communicative limitations (Tr. 385-88). She opined that Plaintiff was to avoid all exposure to hazards (Tr. 388).

On September 14, 2011, Arthur Stair, III, M.A., LPE, conducted a psychological consultative examination of Plaintiff (Tr. 393-97). Following his interview and examination of Plaintiff, he concluded that Plaintiff's ability to understand simple information or directions with the capacity to put it to full use in a vocational setting was not impaired (Tr. 396). Her ability to comprehend and implement multistep complex instructions was not moderately impaired (Tr. 396). Her ability to maintain persistence and concentration on tasks for a full workday and workweek and to adapt to changes in the workplace was mildly impaired due to depressive disorder and anxiety disorder not otherwise specified (Tr. 396). Her social relationships were mildly impaired as she reported decreased contact with others due to depressive disorder and anxiety disorder (Tr. 396).

On September 29, 2011, Jeffrey Wright, Ph.D., concluded that Plaintiff's anxiety and depression, while medically determinable, were nevertheless non-severe impairments because they caused no more than mild limitations in her activities of daily living; social functioning; and concentration, persistence, and pace (Tr. 404-14).

On October 25, 2011, Plaintiff complained to Dr. Gray of headaches, diabetes, and seizures (Tr. 472). Plaintiff had started Kepra – it controlled her seizures, but since she started the medication, she had been having daily throbbing headaches that included blurred vision, phonophobia, and photophobia (Tr. 472). Her diabetes was worsening; her home blood glucose levels ranged from 64 to 278 (Tr. 472). Plaintiff's physical examination was normal (Tr. 473). Dr. Gray stopped Kepra and started topiramate for Plaintiff's seizures (Tr. 473).

On December 1, 2011, Thomas Thrush, M.D., a State agency medical consultant at the reconsideration level, reviewed the record and affirmed Dr. Johnson's September 13, 2011 physical RFC assessment (Tr. 422). Larry Welch, Ed.D., also a State agency physician at the reconsideration level, reviewed the record and affirmed the physical RFC assessment (Tr. 423).

On January 26, 2012, Dr. Gray completed a diabetes mellitus RFC questionnaire (Tr. 479). She stated that she had been treating Plaintiff bimonthly for a year for her seizure disorder and insulin dependent diabetes, with a fair prognosis (Tr. 479). Plaintiff's reported symptoms included fatigue, bladder infections, excessive thirst, abdominal pain, nausea/vomiting, frequency of urination, difficulty thinking/concentrating, headaches, and hyper/hyopglycemic attacks (Tr. 479). She expected Plaintiff's impairments to last at least 12 months; she was not a malingerer; and emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations (Tr. 479). Dr. Gray stated that

5

Plaintiff had mild depression and anxiety (Tr. 480). Her pain or other symptoms were occasionally severe enough to interfere with the attention and concentration needed to perform simple tasks (Tr. 480). She was capable of low stress jobs and needed frequent breaks to check and address her blood sugar (Tr. 480). Dr. Gray opined that Plaintiff could walk five city blocks without rest or severe pain (Tr. 480). Plaintiff could sit for one hour at a time and about four hours total during an eight-hour workday (Tr. 480-81). She could stand for one hour at a time and about two hours total during an eight-hour workday (Tr. 480-81). She did not need to shift positions during the day (Tr. 481). She needed to take five minute breaks each hour to check her blood sugar (Tr. 481). She did not need to elevate her legs (Tr. 481). She did not need to use a cane or other assistive device (Tr. 481). She could lift 10 pounds frequently and 20 pounds occasionally (Tr. 481). She
could frequently twist and climb ladders and stairs and could occasionally stoop, bend, crouch, and squat (Tr. 482). She was to avoid concentrated exposure to cigarette smoke, soldering fluxes, solvents/cleaners, and fumes, odors, and gases (Tr. 482). Her impairments were likely to produce "good days" and "bad days" and she was likely to be absent from work about two days per month as the result of her impairments or treatment (Tr. 483).

On January 31, 2012, Plaintiff followed-up with Dr. Gray for her diabetes (Tr. 469). She reported excessive thirst, foot ulcers, and her feet had been really cold (Tr. 469). Pertinent negatives included blurred vision, constant hunger, chest pain, dyspnea, weight loss, weight gain, or burning of extremities (Tr. 469). Her physical examination was normal (Tr. 470). Dr. Gray noted that Plaintiff had multiple hypoglycemic episodes while experiencing a urinary tract infection, but her symptoms had resolved (Tr. 470). She also increased Plaintiff's insulin to carbohydrate ratio to address Plaintiff's markedly elevated home blood glucose levels (Tr. 470).

On February 6, 2012, Plaintiff complained to Dr. Gray of diabetes, seizures, and foot pain (Tr. 466). She reported hypoglycemic episodes of shakiness and seizure (Tr. 466). Her home blood glucose levels ranged from 39 to 356 (Tr. 466). Dr. Gray noted that while Plaintiff's seizures had previously been controlled, they had increased, although she continued to use medication with fair results (Tr. 466). Her physical examination was normal (Tr. 467).

On March 5, 2012, Plaintiff went to the emergency room with left arm pain (Tr. 443). She had no other complaints and her physical examination was otherwise normal (Tr. 443-45).

On April 16, 2012, Plaintiff complained to Dr. Gray of a bump in her nose, diabetes, anxiety, and heartburn (Tr. 465). Her home blood glucose levels ranged from 39 to 386 (Tr. 463). Her physical examination was normal (Tr. 464). Dr. Gray increased Plaintiff's seizure medication (Tr. 465). She also referred Plaintiff to an endocrinologist, as Plaintiff had a good understanding carbohydrate counting, ate consistent meals, and had erratic blood sugar levels (Tr. 465). Dr. Gray started Plaintiff on medication for her anxiety (Tr. 465).

On May 11, 2012, Plaintiff went to the emergency room complaining of right lower quadrant abdominal pain (Tr. 439). She had no other complaints and her physical examination was otherwise normal (Tr. 439-42).

On July 31, 2012, Plaintiff complained to Dr. Gray of back pain and flank pain (Tr. 460). She also reported a throbbing pain in her lower leg (Tr. 460). Her home blood glucose levels ranged from 54 to 800 (Tr. 460). Dr. Gray noted that Plaintiff's diabetes had improved from her prior visit with fewer low blood glucose levels (Tr. 461).

On October 4, 2012, Dr. Gray noted that Plaintiff's diabetes had improved since her prior visit (Tr. 458). She noted Plaintiff was waiting on a continuous sensor to help tighten control of her symptoms (Tr. 458). She increased Plaintiff's seizure medication and noted that if this did not help, she would consider adding another medication or switching medications (Tr. 458). Plaintiff reported no cough, dyspnea, or wheezing (Tr. 457). Her physical examination was normal (Tr. 458).

[Doc. 22, pgs. 3-11].

At the administrative hearing, the ALJ took the testimony of Dr. Robert Spangler, a vocational expert ["VE"]. The ALJ first asked Dr. Spangler to assume that the plaintiff "is restricted to sedentary work with no exposure to hazards; mentally, assume that she is restricted to performing and maintaining concentration for simple and detailed tasks, and that she is restricted to work that requires no more than occasional public contact." While the plaintiff could not perform her past relevant work with those limitations, Dr. Spangler opined that there were 162,890 jobs in the United States and 3,471 in the state, reduced by 20%, which such a person could perform.[1] The ALJ then asked him to assume the same limitations, except that the person could only stand and walk for two hours total, and that "her ability to sit is restricted to less than six hours total out of an eight-hour day." With those limitations, Dr. Spangler opined that there were no jobs the plaintiff could perform. (Tr. 39-41).

---

[1]Thus, the national total would be 130,312 jobs and the state total would be 2,776.

7

In his hearing decision, the ALJ found that the plaintiff had severe impairments of diabetes mellitus; seizure disorder; migraines; obesity and an affective mental disorder (Tr. 11). He found that she met none of the listed impairments (Tr. 12).

He then assessed the plaintiff's residual functional capacity ["RFC"]. He found that she had the RFC to perform sedentary work with no exposure to hazards. Mentally, she was restricted to performing and maintaining concentration for simple and detailed tasks and restricted to work that requires no more than occasional public contact. (Tr. 14). He then evaluated and discussed the medical evidence. He first discussed her diabetes. He stated that plaintiff did not apparently have "difficulties until July 21, 2010, at which time she presented with early pneumonia and mild diabetic ketoacidosis." (Tr. 14). He then discussed the records of Dr. Katherine Gray, plaintiff's treating physician. He stated "the treatment notes reflect ongoing efforts to control the claimant's blood glucose levels. Although diabetes can be a very serious disease process, the medical evidence does not reflect any residual deficits that are generally associated with diabetes." (Tr. 15).

He then discussed the plaintiff's seizure disorder, including her report of syncope on May 31, 2011. Dr. Gray noted at that time that the plaintiff's "ECG was normal and the claimant had a normal neurological exam." He noted that as of July 6, 2011, plaintiff was reporting that her seizures were occurring two times per day. Dr. Gray began treatment with Keppra, an anticonvulsant. He noted that the plaintiff went to Laughlin Memorial Hospital on June 13, 2011 for evaluation of her seizures. An EEG yielded normal results with no significant asymmetries and no epileptiform discharges. An MRI revealed no acute intracranial abnormalities. (Tr. 15). He mentioned that the plaintiff was evaluated by a

8

neurologist, Dr. Steven P. Rider, on August 9, 2011, but that was before the plaintiff began taking Keppra as prescribed by Dr. Gray. The ALJ concluded that as to her seizures "the episodes have not been clearly identified as to whether they are syncopal episodes related to the endocrine disorder or unrelated seizure activity." (Tr. 16).

He noted that on February 6, 2012, Dr. Gray observed that the plaintiff was experiencing some hypolglycemic episodes with shakiness and seizure. He mentioned the report submitted by Dr. Gray dated January 26, 2012, containing her opinion of the effects of plaintiff's diabetes on her RFC. He stated "Dr. Gray submitted that the claim ant could lift/carry 10 pounds frequently, 20 pounds occasionally, could *occasionally* perform activities including stooping (bending) or crouching and squatting and could *frequently* perform twisting and climbing ladders or stairs. She could walk five city blocks without rest or severe pain. She could sit or stand for one hour (at a time), sit four hours total or stand/walk for two hours total." [emphasis added]. The ALJ stated that while the "restrictions appear highly restrictive, the exertional strength limitations are more consistent with light exertion." (Tr. 16).

He then discussed the plaintiff's mental impairment, including her examination by consultative mental examiner Arthur Stair, III. He noted that Mr. Stair opined her ability to understand simple information is not impaired. The ALJ pointed out that Mr. Stair's report with respect to the plaintiff's ability to understand complex instructions is unclear, ending in "is not moderately." Her ability to maintain persistence and concentration is mildly impaired. Her ability to adapt to changes in the workplace is mildly impaired, as are her social relationships. (Tr. 17).

The ALJ then stated that the plaintiff's statements regarding the limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC he found. He noted that the evidence showed that the plaintiff "was able to sit, stand, walk and move about in a satisfactory manner." He then stated that he had reduced her RFC to accommodate her complaints of fatigue and depression "with provisions for simple and routine tasks." He stated that "no treating physician has indicated that the claimant was totally disabled...and no treating physician limited the claimant's activities." He noted the plaintiff's lack of financial resources but stated "the record does not indicate she has been turned away from an emergency room or been refused treatment by a physician." He stated that plaintiff had submitted forms regarding her condition which stated she had no problems with personal care and did not need reminders to care for her personal needs or for taking medicine. She lived alone, prepared her own meals, cared for her small child, could drive, shopped for food and other necessities and attended church. He thus found her allegations of disabling impairments were not supported by the record as a whole. (Tr. 17-18).

He then evaluated and attached weight to the opinions of the examining and non-examining physicians. He gave little weight to the state agency physical and mental doctors, finding that the evidence supported a more limited RFC. He gave great weight to Dr. Stair. (Tr. 18).

He then discussed the opinion of Dr. Gray. He noted that Dr. Gray opined that the plaintiff could walk without rest or pain for 5 city blocks. He mentioned Dr. Gray found strength limitations of 10 and 20 pounds frequently, which was higher than the sedentary level he opined in his RFC. He then stated "there is no evidence to support the limitations

10

(on stooping and squatting) as assessed." He also gave his reasons for not accepting Dr. Gray's restrictions on sitting, standing and walking. He said those restrictions "are not supported by the evidence as Dr. Gray submitted that the claimant could walk five blocks without rest or severe pain and there is no medical basis for respiratory restrictions." Since the plaintiff submitted evidence that she checked her blood sugar four to five times a day he found Dr. Gray's opinion that the plaintiff would need hourly breaks to check her blood sugar levels was unsupported, and that she could perform needed checks on breaks and during her lunch period. (Tr. 19).

While she could not perform her past relevant work, the ALJ found that the VE had identified a significant number of jobs which the plaintiff could perform. Accordingly, he found that she was not disabled. (Tr. 19-21).

Plaintiff asserts that the ALJ erred as a matter of law in not giving proper weight to the opinion of Dr. Gray, the treating physician. She also asserts the ALJ "committed an error of law in not following her own rules and regulations in assessing..." plaintiff's credibility.

Regarding the weight the ALJ assigned to Dr. Gray, the plaintiff points to the four reasons the ALJ gave in making the decision to afford her little weight. Those reasons were (1) the fact that Dr. Gray indicated plaintiff could lift on a level consistent with light as opposed to sedentary exertion; (2) that there were no facts to support the limitations on stooping and squatting; (3) that Dr. Gray's limitations on sitting, standing and walking were not supported given her ability to walk 5 blocks and had no documented respiratory restrictions; and (4) the need to take hourly breaks to check blood sugar was not substantiated by the records submitted by the plaintiff.

11

With respect to the first reason for rejecting Dr. Gray's opinion, the amount plaintiff can lift, plaintiff states that the limitation imposed by Dr. Gray on sitting to four hours a day shows a limitation to sedentary exertion irrespective of the amount plaintiff could possibly lift. Regarding the second reason, the restriction on stooping and squatting, plaintiff points to Dr. Gray's awareness of plaintiff's obesity and fatigue, hypoglycemic episodes, and foot ulcers, as support for postural limitations in these areas. As for the third reason, regarding Dr. Gray's limitations on her ability to only sit for 4 hours and stand or walk for 2 hours, plaintiff says the ALJ gave "no analysis or explanation of how it (the opined ability for plaintiff to walk 5 city blocks without pain) was used in giving weight to Dr. Gray's opinion." Plaintiff also argues that Dr. Gray restricting plaintiff to avoid concentrated exposure to cigarette smoke and other fumes and odors makes Dr. Gray's assessment reasonable. Finally regarding the fourth reason, the ALJ's finding of a lack of need for hourly blood sugar readings in light of the plaintiff's chart showing testing four or five times a day, plaintiff states those charts showed the plaintiff was experiencing difficulties at the time she did the testing such as headaches and having seizures and feeling better after eating and going to bed. Plaintiff asserts that the ALJ's reasons are not supported by the evidence and are not sufficiently specific to make clear under Social Security Ruling 96-2p why he gave Dr. Gray little weight.

SSR 96-2p of course states that a treating source must be given controlling weight if it is "well-supported and not inconsistent with the other substantial evidence in the record..." Moreover, if the ALJ is not going to give the treating physician's opinion controlling weight, he or she is required to give good reasons for discounting the weight given to the opinion of

12

Case 2:14-cv-00112-JRG-MCLC   Document 23   Filed 04/30/15   Page 12 of 16   PageID #: 634

the treating source.

There have been cases which state that it is sufficient for an ALJ to state that controlling weight is not being given to a treating physician because the opinion is "not well supported by the overall evidence of record and is inconsistent with other medical evidence of record." *Bledsoe v. Barnhart*, 165 Fed. Appx. 408, 412 (6th Cir., 2006). That having been said, this Court feels that more specificity is certainly advisable. The Court also feels that more reasons were given, and that these reasons were valid.

For example, in the first reason given by the ALJ, it appears obvious to the Court that the ALJ was stating that the 20 pound weight limit was what the ALJ was referring to in finding that Dr. Gray's lifting capabilities detracted from Dr. Gray's severe restrictions on sitting, standing and walking. Furthermore, while the ALJ rejected the state agency physician's assessment that the plaintiff had no exertional limitations, the fact that this opinion existed supports the ALJ's decision to not give Dr. Gray controlling weight. The fact that Dr. Gray opined that plaintiff could walk 5 city blocks also conflicts with her severe restrictions. Also, while plaintiff's obesity exists, and the ALJ noted that it did, the plaintiff's young age and activities are present too, and detract from a limitation on stooping and squatting. In any event, Dr. Gray only opined that the plaintiff was limited to occasionally stooping and squatting. Also, plaintiff's numerous physical examinations performed were normal. Also, plaintiff herself did not mention squatting or bending, or any physical activity other than lifting, as being affected by her illness (Tr. 152).

The ALJ accepted those portions of Dr. Gray's report which he found supported. In the opinion of this Court he gave adequate reasons for discounting the portions of Dr. Gray's

13

report which were not well-supported or conflicting. The Court understands his thought process and feels that he did not violate SSR 96-2p or the applicable case law.

With respect to his finding that the plaintiff was not entirely credible to the extent her complaints conflicted with his RFC finding, plaintiff asserts that the ALJ failed to follow SSR 96-7p. Basically and unembellished, this ruling requires an ALJ to consider the entire case record, including the claimant's statements and the objective medical evidence and opinions of the physicians and psychologists and "draw appropriate inferences and conclusions about the credibility of the individual's statements."

As stated by the Commissioner, and the Sixth Circuit, credibility determinations rest with the ALJ, and "as long as the ALJ cite[s] substantial, legitimate evidence to support his factual conclusions, we are not to second-guess." *Ulman v. Commissioner of Soc. Sec.*, 693 F.3d 709, 713-14 (6th Cir. 2012). His determinations in this regard as the finder of fact are not to be dismissed lightly by the court. Here, as in most cases, the ALJ *found* the plaintiff credible to a great degree. He took her statements into account in rejecting the opinions of the state agency doctor and psychologist.

Plaintiff lists three reasons given by the ALJ for finding her completely credible. First, she takes issue with his reasoning that no treating physician has opined that she was totally disabled and that no treating physician limited her activities. Plaintiff points out that Dr. Gray's opinion stated limitations on her activities. However, the ALJ is talking about limitations prescribed by a physician in the treatment records themselves. Dr. Gray did not advise plaintiff to limit her activities. This is a different matter from the doctor's opinion regarding functional capacity. Repeated indications to a patient not to do this activity or that

14

is a serious matter, but is lacking in this case. The ALJ could certainly consider the lack of such advice in determining credibility.

Second, the ALJ pointed out that "while the evidence suggests that the claimant did not seek medical treatment due to financial inability, the record does not indicate that she had been turned away from an emergency room or been refused treatment by a physician." Plaintiff argues that "there is no way to tell from the decision what weight the ALJ gave this statement or what the relevance of the statement is." [Doc. 20, pgs 10-11]. Conservative treatment is certainly a basis for a finding that a plaintiff is not entirely credible in his or her subjective complaints. *See*, *Helm v. Commissioner of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011), *Villarreal v. Sec. of H.H.S.*, 818 F.2d 461, 463 (6th Cir. 1987), *Curler v. Commissioner of Soc. Sec.*, 561 F. App'x 464, 473 (6th Cir. 2014). The ALJ did not err by pointing out that her financial status was not shown to have impacted the treatment she received, and that treatment was conservative.

Third, the plaintiff asserts that the ALJ erred in stating that plaintiff's listed activities belied her subjective complaints. Plaintiff does point out that she said in that same form on which the ALJ relied that others help her with these tasks when she is having a seizure or a migraine. However, it appears to this Court that the ALJ considered the evidence of her seizures and migraines, indeed he found that they were severe impairments. He did not find the evidence established restrictions beyond his RFC finding, and the same factors into his analysis of her credibility. Daily activities are certainly a valid factor to consider in credibility. Cases have suggested that these should not perhaps be the *only* factor an ALJ considers in many circumstances. *See, Temples v. Commissioner of Soc. Sec.* 515 F. App'x

15

460, 462 (6th Cir. 2013).  But it is certainly a valid factor to consider among others, which is what the ALJ did here.

While this is a very close case, there is substantial evidence to support the ALJ's findings, and he adequately followed the regulations, rulings and case law.  If plaintiff's conditions are more clearly debilitating and disabling now than at the time this case was decided, she should file another applications.  However, the evidence that was before the ALJ supports his decision.  It is therefore respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 18] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 21] be GRANTED.[2]

Respectfully submitted,

 s/ Dennis H. Inman
United States Magistrate Judge

---

[2]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived.  28 U.S.C. 636(b)(1).